UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 25 CR 773 |
| v. | ) | |
| | ) | Magistrate Judge Keri L. Holleb Hotaling |
| LUIS URIBE | ) | |
| | ) | |

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF DETENTION

The United States of America, by its attorney, ANDREW S. BOUTROS, United States Attorney for the Northern District of Illinois, hereby submits this memorandum in support of the government's request that the defendant be detained pending trial.

## INTRODUCTION

Defendant is a serial rapist who turned his position as a United States Customs and Border Protection ("CBP") officer into a license to commit or attempt to commit gunpoint sexual assaults and robberies of four different women. All of the victims were of Chinese descent, and they all occurred in the Chicago suburbs. As described in the indictment, on six separate occasions throughout 2022, defendant forced his way into a hotel room where the victims were staying, and either robbed or attempted to sexually assault the victims, or both. At the time, defendant was employed as a CBP officer, primarily assigned to O'Hare Airport. Defendant used his service weapon, badge or credentials, as well as the power of his position, to force the victims to perform oral sex, to submit to vaginal sex, or to provide him with cash. One of the victims, Victim B, was attacked on three separate occasions by defendant.

The government respectfully submits that there are no conditions or combination of conditions of release that would assure the appearance of defendant in Court and protect the safety of the victims and the community. Additionally, the government submits that there exists a serious risk that defendant will flee and that he will obstruct or attempt to obstruct justice. Consequently, defendant should be detained pending trial.

## BACKGROUND

### *Defendant's Position at CBP*

As described in the indictment, in 2022, defendant was employed as an officer with CBP, where he was primarily assigned to O'Hare Airport. As a CBP officer, he was issued a service weapon, which was a black handgun, a badge, credentials, and a uniform. Defendant had certain law enforcement powers throughout Illinois and the United States, and he was authorized to carry his firearm and badge while off-duty.

### *Victim A*

In early 2022, Victim A traveled to Chicago from out-of-state and stayed initially a hotel in Schaumburg, Illinois. One day, while at the hotel, Victim A heard a knock at the door and opened the door. It was defendant, who pushed his way into her room and displayed what Victim A described as an ID card with his picture on it. Her description is consistent with the credentials issued to CBP officers. Defendant stated that he was a police officer, that he was investigating Victim A, and that she needed to cooperate with him. Defendant then grabbed Victim A's head and pushed

it down onto the bed. He pulled out a firearm and held it up to Victim A's head. Defendant ordered Victim A to perform oral sex, and pulled his penis out of his pants. Victim A begged defendant repeatedly, and offered him money. Defendant ultimately agreed, and prior to him leaving the hotel room, pointed his gun at Victim A and told her not to look at him.

*Victim B*

Victim B traveled with Victim A to Chicago, although Victim B initially stayed in a different hotel in Naperville, Illinois. Victim B came to Chicago because she was employed in the sex work industry, and she worked for a madame or boss who was located in Chicago. While at the hotel in Naperville, defendant knocked on Victim B's door, and she answered. Defendant forced his way into the room, brandished a gun and a badge, and identified himself as police. He then demanded money, and Victim B provided him with a quantity of cash. Defendant pulled down his pants, exposing his penis, and forced Victim B to perform oral sex. Victim B screamed for help, and defendant hit her. Victim B then performed oral sex on defendant without her consent. When she could sense that defendant was close to ejaculating, she pulled away. Defendant became irate and grabbed Victim B's face with his hand, forcing her mouth open. Defendant then spit into her mouth.

As a result of this incident, Victim B moved to a different room at the same hotel in Naperville. However, after moving, defendant victimized her again. On that second occasion, defendant forced his way into her room and robbed her of money.

However, because defendant heard people outside the hotel room, he left the room without sexually assaulting her.

Victim B then moved to a different hotel altogether, where she stayed with Victim A, although her attempts to avoid defendant were again unfortunately unsuccessful. Shortly before Victim B was to leave Chicago, Victim A left the room to purchase groceries. While she was gone, Victim B heard a knock at the door. Thinking that it was Victim A returning, Victim B opened the door. It was defendant. He again forced his way into room at gunpoint. He demanded money, and Victim B provided a quantity of cash. Defendant demanded oral sex, and Victim B begged, "no, no." Defendant grabbed her face, forced her mouth open, and again spit into her mouth. Defendant forced Victim B to take off her clothes and raped her vaginally. Victim B was screaming, and defendant hit her on her face. Later on, when Victim A returned to the room, she saw that the room had been ransacked, Victim B was crying, and there were red marks on Victim B's face.

*Victim C*

After these incidents in early 2022, word of defendant's rampant abuse of sex workers in the Chicagoland area began to spread amongst the community, and they tried to self-help. One sex worker ("Witness A") was working for a boss, likely based in China. The boss tasked Witness A to meet with defendant at a neutral location for two purposes: (1) to obtain a photograph of defendant for distribution amongst members of the community; and (2) to attempt to bribe him into stopping his attacks on workers. Witness A was selected because she had previously encountered

defendant when he was her paying client. Ultimately, the meeting was set at a seafood buffet in the northwest suburbs of Chicago, and Witness A and others met with defendant. During the meeting, they took a photograph of defendant at the restaurant, which is below, and is next to a driver's license photograph of defendant.





During the meeting, Witness A offered defendant a deal: if he stopped attacking workers, they would provide him with free commercial sex with sex workers. Defendant agreed, however, he did not abide by the terms of the bargain.

On October 2, 2022, Victim C was staying in a hotel in Schaumburg, Illinois. She heard a knock on the door, which she believed to be from housekeeping. When she answered the door, defendant pushed into the room and brandished a badge and gun. Victim C's description to law enforcement of the badge and gun were consistent with defendant's CBP-issued badge and his service weapon. Defendant demanded

money, and Victim C provided him with cash. Defendant instructed Victim C to remove her clothing, which she did. Then, defendant forced Victim C to perform oral sex as well as vaginal sex. Afterwards, defendant fled the room. Victim C reported what happened immediately afterwards to another individual staying at the hotel, Victim D.

Approximately two days later, members of the Schaumburg Police Department responded to the hotel, where they interviewed Victim C and Victim D. Victim C reported that she had been raped and robbed, and provided the above-photograph of defendant at the restaurant to local police. Additionally, the Schaumburg Police Department collected forensic evidence from Victim C's hotel room, including bedding. The bedding was later sent to the FBI laboratory for analysis, where analysts determined that there was a "very strong support for inclusion" of defendant's DNA, in that it was approximately 97 sextillion times more likely that defendant's DNA was included on one portion of the bedding than an unknown person's.

Members of the Federal Bureau of Investigation ("FBI") and Department of Homeland Security, Office of Inspector General ("DHS-OIG") obtained travel and location information for defendant surrounding this incident, including iPass records for a vehicle registered to defendant, and information from Google associated with defendant's account. That information showed that defendant left work at O'Hare and traveled west on I-90. While on the highway, defendant searched in Google Maps for the hotel where Victim C was staying. Toll data was consistent with defendant

committing the rape of Victim C, as his trip between the Devon Avenue Toll Plaza and Elgin Toll Plaza took significantly longer than would be expected for that time of day. Notably, Victim C's hotel is located between those toll plazas. Additionally, information from Google showed that during this trip, defendant installed and then uninstalled an encrypted messaging application. In fact, defendant's Google account showed that overall, he installed and uninstalled messaging applications hundreds of times.

*Victim D*

As described above, Victim D was staying at the hotel in Schaumburg when Victim C was raped and robbed. Victim D was employed in sex work at the time, and reported the incident with Victim C to her boss. Additionally, in an attempt to avoid potentially being attacked, Victim D moved to a different hotel in Schaumburg. However, a few days later, Victim D was also attacked. On that day, defendant knocked at the door, and Victim D answered. Defendant pushed his way in, pulled out a gun, and told Victim D that he was police. Defendant went through Victim D's belongings and took a quantity of cash. Defendant also pulled out a knife, and ordered Victim D to remove her clothing. Victim D begged defendant not to hurt her, telling him that she had children. Defendant pulled out his penis and was about to rape Victim D when there was a knock at the door. Defendant pulled up his pants and fled from the hotel.

On December 4, 2025, the Grand Jury returned an indictment charging defendant with ten counts of deprivation of rights under color of law, in violation of

18 U.S.C. § 242, and one count of brandishing a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii). On December 9, 2025, defendant was arrested while at work at a CBP facility, and appeared before the Court. The government moved orally for detention pursuant to 18 U.S.C. § 3142(e)(3). Detention is warranted here.

## ARGUMENT

Defendant should be detained pending trial. Pursuant to 18 U.S.C. § 3142(e), because defendant has been charged with a violation of 18 U.S.C. § 924(c), there is a presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." Defendant poses both a risk of danger to the community as well as a flight risk, and he cannot overcome the statutory presumption in favor of detention in this case.

### I. Defendant Poses a Serious Risk of Flight

Defendant poses a serious risk of flight warranting detention. First, the nature of the circumstances of the offense weigh in favor of detention. *See* 18 U.S.C. § 3142(g)(1) (the "nature and circumstances" of the offense charged, including whether the offense is a crime of violence and involves a firearm, is a factor to be considered). Here, defendant committed multiple gunpoint rapes, sexual assaults, and robberies of four victims in the Chicagoland area. As a result, defendant faces extremely serious charges, which is also reflected in the potential penalties that he faces. Namely, counts 1, 3, 6, 7 and 10, which charge violations of 18 U.S.C. § 242 involving either aggravated sexual abuse or attempted aggravated sexual abuse carry a

potential sentence of up to life imprisonment. Additionally, count 8, which charges 18 U.S.C. § 924(c)(1)(A)(ii), carries a mandatory minimum consecutive sentence of 7 years of imprisonment, up to life imprisonment. In other words, defendant faces the very real possibility that he will spend the remainder of his life, or a very significant percentage of it, in the Federal Bureau of Prisons, and therefore has a strong incentive to flee. *See United States v. Zhang*, 55 F.4th 141, 151 (2d Cir. 2002) ("The prospect of a severe sentence can create a strong incentive for a defendant to flee and thereby avoid that sentence); *United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) (lengthy sentence provides a great incentive to flee); *United States v. El-Gabrowny*, 35 F.3d 63, 65 (2d Cir. 1994) (lengthy term of imprisonment provides a great incentive to flee).

Further, the evidence in this case is strong. The indictment alleges that defendant sexually assaulted and robbed four different women over several months in 2022. Multiple victims have provided information against defendant, and that information is detailed and corroborated, including by other witnesses. For instance, multiple victims described the appearance of defendant's badge, which is consistent with a standard-issue CBP badge. Victim C reported that she was raped to Victim D immediately afterwards, and spoke to the Schaumburg Police Department within days. Defendant's DNA was found on bedding in Victim C's hotel room, and Google search history, location information, and toll records place defendant at the scene of that rape. Because defendant had committed prior rapes and robberies of sex workers, members of that community already had defendant's photograph when the

last two attacks occurred, and Victims C and D provided that photograph to law enforcement. Additionally, the government is continuing to investigate defendant's conduct, and believes there may be additional victims identified in the future.

The characteristics of defendant also support detention. Defendant was a sworn CBP officer when he committed these offenses, meaning that he was willing to violate his oath to commit rapes and robberies. Similarly, defendant is unlikely to take a deferential view toward Court orders to appear, particularly given the strong incentive to flee. Further, it is believed that defendant has dual United States/Mexican citizenship, and possesses a U.S. passport. Defendant also has traveled internationally within the past several years. In short, defendant is a serious flight risk, and defendant should be detained.

## II. Defendant Poses a Danger to the Community

Defendant also poses a danger to the community. Defendant committed multiple horrific rapes and robberies of victims in the Chicagoland area, prompting members of the sex worker community to set up a meeting to attempt to persuade him to stop. Nevertheless, defendant continued to sexually assault victims under color of law. Other courts have found that law enforcement officers who commit sexual assaults pose a danger to the community. For instance, in *United States v. Ruiz*, No. 4L20-cr-00582-1, 2021 WL 1427804, at *4 (S.D. Tex. Apr. 15, 2021), the court ordered detained a police officer who was charged with violating 18 U.S.C. § 242 and 18 U.S.C. § 924(c)(1)(A) when he committed two sexual assaults while on duty. The *Ruiz* court noted that due the "nature of the alleged underlying conduct,"

the "danger posed to the victims and to the community by any subsequent similar act is severe." *Id.* Additionally, the court stated, "it simply can't be ignored that Ruiz committed these offenses while in the line of duty as a police officer," and that defendant "had to disregard and overcome specific legal training in addition to the usual moral and legal constraints against such conduct." *See also*, *United States v. Torrence*, No. 1:22-cr-00207, Rec. Doc. 18 (E.D. Cal. Aug. 16, 2022) (former police officer charged with committing multiple sexual assaults ordered detained).

Furthermore, information from defendant's Google account showed that he used encrypted messaging applications, and that he installed and uninstalled these applications hundreds of times. For instance, between approximately 2021 and 2023, defendant installed and uninstalled the application TextNow over 300 times, and the application 2ndLine over 130 times. These repeated installations and uninstalls show that defendant was destroying evidence of his conduct during this time period, and attempting to evade responsibility. There is every reason to believe that now that he is facing significant potential jail time, defendant would continue to attempt to destroy evidence and obstruct justice, including through potential witness tampering.

In short, defendant poses a danger to the community and to victims. There are no conditions or combinations of conditions that would satisfactorily alleviate these concerns. Defendant should be detained.

WHEREFORE, for the reasons discussed herein, the government respectfully requests that the Court grant the government's motion and order defendant detained pending trial.

Date: December 9, 2025

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: */s/ Jonathan L. Shih*
JONATHAN L. SHIH
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, IL 60604
(312) 353-5300